[Civ. No. 16188.   Second Dist., Div. One.   Aug. 14, 1948.]

ALEXA M. MATASSA, Appellant, v. THOMAS J. MATASSA, Respondent.

William C. Ring for Appellant.

Wood, Crump, Rogers, Arndt & Evans and Roger Marchetti for Respondent.

YORK, P. J.—Plaintiff appeals from those portions of an interlocutory judgment granting her a divorce from defendant whereby the court adjudged (1) "that there is no community property belonging to the parties hereto, except two vacant lots in San Fernando, . . . of the value of approximately $1,000.00, and that the parties in and by a written agreement of August 31, 1943, adjusted and settled community property and other rights as in said Agreement provided, and said Agreement is hereby approved." And (2) "that pursuant to said Agreement, plaintiff shall not recover costs, attorneys' fees, damages of any nature, or alimony by reason of her complaint herein." Plaintiff also appeals from a minute order of the trial court granting defendant's motion to amend findings of fact, conclusions of law and the interlocutory judgment of divorce.

By stipulation of the parties both appeals are submitted upon a consolidated record and one set of briefs.

By her complaint herein, plaintiff sought a divorce from defendant on the ground of extreme cruelty, and for awards of the custody of the minor child of the marriage, and of her interest in community property, alimony, attorneys' fees and costs.

The cause came to trial upon the issues presented by the complaint, defendant's answer and amendment thereto, his cross-complaint (alleging cruelty on the part of plaintiff), and the answer of plaintiff to such cross-complaint. In his amendment to the answer, defendant alleged the execution by him and plaintiff of a property settlement agreement, and prayed for a declaration of the rights of the parties thereunder and for an approval of the enforceable executory provisions thereof.

Said agreement reads as follows:

"This agreement, made and executed this 31 day of August, 1943, by and between Alexa Matassa, of the City and County of Los Angeles, State of California, herein mentioned as party of the first part, and Thomas J. Matassa, of the same place, herein mentioned as party of the second part: WITNESSETH:

"That whereas, the parties hereto are husband and wife, and are desirous of settling any and all of their property rights

now existing between them: to the end that these rights may be definitely understood and placed beyond dispute and argument; and

"Whereas, said party of the second part owns, in his own rights, certain Real Properties, some of which are improved and some unimproved, and,

"Whereas, it is the desire of the party of the second part to provide for party of the first part, his wife;

"Now, THEREFORE, in consideration of the covenants and mutual agreements herein contained, it is hereby agreed by and between the parties hereto as follows, to-wit:

First. That the party of the first part shall have an inheritable interest in all of the Real Property party of the second part now owns and had in his possession at the time of the marriage of said parties, or to which he was entitled at that time.

Second. That all property acquired subsequent to marriage by either of said parties, shall be considered, and shall be community property of the parties hereto, and said parties shall share and share alike.

Third. That party of the first part shall keep and shall be the sole owner of all real property now standing in her name, party of the second part having and retaining an inheritable interest therein except party of the first part shall not sell or hypothecate same without the written consent of party of the second part.

Fourth. That in the event either party hereto should at any time institute an action for divorce or any Court action against the other, neither of said parties shall ask for or be allowed or given costs, attorney fees, or damages of any nature whatsoever therein.

Fifth. That in the event party of the first part should at any time institute an action in Court for divorce against party of the second part she hereby waives all rights for costs, attorney fees and all alimony.

Sixth. That the parties hereto shall, to the best of their ability endeavor to interest themselves and to be concerned in the business in which they are engaged.

Seventh. That they, the parties hereto, will at all times, freely sign any and all papers, documents, leases, deeds, trust deeds, mortgages or other necessary papers, at any time when requested so to do by the other party, in any and all transactions in connection with the buying, selling, hypothecating or handling of the property of the parties hereto.

Eighth. That it is hereby understood that this agreement is freely, frankly and openly made and for the sole purpose of the mutual benefit and understanding of the parties hereto.

"The parties hereto stating that they each have read the above, and that they understand the statements therein, set down and that they sign same of their own free will and accord, the day and year first above written."

This document was subscribed and sworn to by the parties named under date of September 3, 1943.

At the conclusion of the trial, the court found:

I. That defendant had been guilty of extreme cruelty toward plaintiff;

II. That "there is no community property";

III. That plaintiff "has no funds or money for her support, but that plaintiff and defendant entered into a property settlement agreement on August 31, 1943, in words and figures as follows: . . ."

That this agreement was entered into freely and voluntarily by the parties;

That no property was acquired by either party subsequent to marriage, except two vacant lots in San Fernando, of the value of $1,000, which were acquired by defendant subsequent to marriage and that the plaintiff owned no property at the time of her marriage. That "the provisions of paragraphs Second and Third of said agreement are severable from the rest of said agreement, and the provisions of said paragraphs Second and Third are so indefinite and uncertain that the purpose and intention thereof cannot be determined and the same are not enforceable."

IV. That plaintiff is a fit and proper person to have custody of the minor child and is awarded the custody of such child.

V. That the maintenance and support of said minor child requires the use of the residence heretofore occupied by the parties at 346 South Gramercy Place, which is within the ability of defendant to provide and necessary to support and educate the child in its station of life. It being further found that $75 per month is a reasonable sum for defendant to pay to plaintiff for and on account of the support of said minor, payable through the court trustee, commencing December 1, 1946.

VI. That by reason of the aforesaid contract, it is not true that plaintiff requires any sum from defendant on account of costs, attorney's fees, alimony, or other relief or damage, ex-

cepting only insofar as hereinabove found relating to the support of said child.

VII. That the allegations of defendant's answer that all of the property enumerated in paragraph III of plaintiff's complaint is the separate property of the defendant, as having been earned and purchased by him prior to his marriage to plaintiff, are true;

VIII-IX. That the allegations of cruelty contained in defendant's answer and cross-complaint are not true and not sustained by any evidence.

X. That the allegations of paragraphs I and II of the amendment to the answer are true and are sustained by the evidence, and that the parties adjusted and settled property and other rights as provided under and by the terms of the said agreement of August 31, 1943; that said agreement was fair, equitable, and is approved by the court.

From such facts the court concluded:

I. Plaintiff is entitled to a decree of divorce.

II. Defendant is not entitled to take anything by his cross-complaint.

III-IV. Plaintiff is entitled to custody of minor child and to $75 per month for support of said minor, and to the use and occupancy of the residence at 346 So. Gramercy Place for the maintenance and support of said minor.

V. There is no community property except the two vacant lots at San Fernando of the value of $1,000, as to which each of the parties is entitled to one-half interest. ''That the parties in and by said agreement of August 31, 1943, adjusted and settled the property and other rights as in said agreement provided. That pursuant to said agreement plaintiff is not entitled to costs, attorney fees, damages of any nature, or alimony, nor is she entitled to any interest in any of the property owned by the defendant at the time of the marriage of the parties or to which defendant was entitled at that time. That all property owned by defendant at the time of his marriage is his sole and separate property. That said agreement of August 31, 1943, is entitled to the approval of this court and it is approved.''

The interlocutory judgment of divorce after decreeing in accordance with the above findings and conclusions, further adjudged:

''that *subject to said right of inheritance,* the defendant is owner of all real property mentioned in the pleadings (with

the exception of the two lots above mentioned), and all real property owned by defendant and in his possession at the time of marriage of said parties on June 27, 1943, or to which defendant was entitled at said time, as his sole and separate property, and that plaintiff's only right, title and interest therein and thereto is her aforesaid right of inheritance pursuant to the terms of said Agreement of August 31, 1943.''

Such interlocutory judgment of divorce was entered on November 21, 1946, and notice of appeal therefrom was filed on January 20, 1947.

Thereafter, to wit, on January 27, 1947 (while said appeal was pending) defendant's counsel filed notice of motion to amend the findings of fact, conclusions of law and the interlocutory judgment ''for the purpose of correcting therein clerical errors.''

On March 31, 1947, the court entered its minute . order granting said motion and on May 26, 1947, plaintiff took an appeal from such minute order. On June 9, 1947, the court signed a written order granting defendant's motion to amend the findings of fact, conclusions of law and the interlocutory judgment, amending the same *nunc pro tunc* as of November 20, 1946, which order was duly entered as of July 11, 1947.

The effect of the amendments, which were made by interlineation, was to add to finding II after the words ''there is no community property'' the following: ''*except as found in paragraph III hereof.*'';

To change the word ''Second'' appearing in the last sentence of finding III to the word ''First'';

Finding X is changed to read as follows: ''That the allegations of Paragraphs I and II of the Amendment to the Answer are true and are sustained by the evidence, and that the parties adjusted and settled property and other rights as provided under and by the terms of said agreement of August 31, 1943, *except that as found in paragraph III hereof the provisions of paragraphs First and Third of said agreement are severable from the rest of said agreement and are so indefinite and uncertain that the purpose and intention thereof cannot be determined and the same are not enforceable*; that said Agreement was fair, equitable, and *subject to said exception* it is approved by the Court.''

Conclusion of law numbered V was amended in accordance with above quoted finding of fact numbered X.

Two paragraphs of the interlocutory decree of divorce were amended to read as follows:

(a) "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there is no community property belonging to the parties hereto, except two vacant lots in San Fernando . . . of the value of approximately $1,000.00 and that the parties in and by a written Agreement of August 31, 1943, adjusted and settled community property and other rights as in said Agreement provided, *except that the provisions of paragraphs First and Third of said agreement are severable from the rest of said agreement and are so indefinite and uncertain that the purpose and intention thereof cannot be determined and the same are not enforceable, and subject to said exception* said Agreement is hereby approved."

(b) "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the *defendant is the owner of all property mentioned in the pleadings (with the exception of the two lots hereinabove mentioned), and all property owned by defendant at the time of the marriage of said parties on June 27, 1943, or to which defendant was entitled at said time, is his sole and separate property, and that plaintiff is not entitled to any interest in any of the property owned by defendant at the time of the marriage of said parties or to which defendant was entitled at that time.*"

Recapitulating: the effect of the order *nunc pro tunc* entered on July 11, 1947 was as follows:

(1) To correct finding II by placing in the category of community property the two vacant lots in San Fernando, as authorized by paragraph second of the agreement;

(2) To correct the last sentence of finding III by eliminating reference to paragraph second of the agreement (dealing with community property) and inserting in lieu thereof a reference to paragraph first of the agreement which gave to the wife an inheritable interest in the husband's property;

(3) To eliminate from the findings, conclusions and judgment all reference to rights of inheritance of both parties, and to approve the property settlement agreement, except as to paragraphs first and third which gave to each party an inheritable interest in the property of the other, the two excepted paragraphs being disapproved on the ground that they were severable from the rest of the agreement, and so indefinite and uncertain that their purpose and intention were not ascertainable, hence were unenforceable.

On the first appeal from portions of the interlocutory judgment, it is contended:

1. The execution of the postnuptial settlement agreement was induced by defendant's coercion of plaintiff and her misunderstanding of its nature, operation and effect; by defendant's concealment of his financial worth, and by her mistake concerning the same; it is unfair, inequitable and unjust as to her, and the court erred in approving and enforcing it to bar her alimony and costs.

2. The court abused its discretion in approving an inequitable settlement agreement to deny the innocent wife alimony necessary for her support.

3. Findings II, III and VII, conclusion V, and the adjudication that the parties own no community property, excepting two lots in San Fernando, are contrary to the evidence and the law.

On the second appeal from the minute order of the court granting defendant's motion to amend the findings, conclusions and judgment, it is contended:

1. No clerical errors in its findings, conclusions and judgment authorized the trial court's revisions thereof;

2. The trial court lacked jurisdiction (1) to vary the parties' rights, or (2) pending appeal, to correct its findings, conclusions and judgment *nunc pro tunc* to defeat plaintiff's rights to move for a new trial and for different findings and conclusions;

3. The trial court erred in construing and finding paragraphs first and third of the property settlement so uncertain and vague as to be unenforceable; and the husband is estopped to so assert;

4. The trial court was not empowered, under the pretext of correcting clerical errors, to revise its approval, or otherwise disapprove, that part of a property settlement, granting the innocent wife an "inheritable interest" in her guilty husband's property, whence it had adjudged her waiver of alimony and suit fees, without abrogating her waiver of the latter;

5. Findings II, III and VII, conclusion V and the judgment that all the real property is the husband's separate estate and that the parties own no community property, except the San Fernando lots, are contrary to the evidence and the law;

6. The court erred in not finding what income from the parties' "business" was community property.

At the outset it should not be overlooked that the agreement here under consideration is a postnuptial property settlement agreement, executed within a few weeks after the marriage of the parties, and is in no sense a separation agreement or one made in contemplation of divorce.

As stated in *Adams* v. *Adams*, 29 Cal.2d 621, 624 [177 P.2d 265] : "Property settlement agreements occupy a favored position in the law of this state and are sanctioned by the Civil Code. (*Hill* v. *Hill*, 23 Cal.2d 82, 89 [142 P.2d 417]; *Hensley* v. *Hensley*, 179 Cal. 284, 287 [183 P. 445]; Civ. Code, §§ 158, 159.) Such agreements are usually made with the advice of counsel after careful negotiations, and the courts, in accord with legislative sanction, prefer agreement rather than litigation. (*Hill* v. *Hill*, supra at p. 89.) When the parties have finally agreed upon the division of their property, the courts are loath to disturb their agreement except for equitable considerations. A property settlement agreement, therefore, that is not tainted by fraud or compulsion or is not in violation of the confidential relationship of the parties is valid and binding on the court. (*Hough* v. *Hough*, 26 Cal.2d 605, 614 [160 P.2d 15]; *Hogarty* v. *Hogarty*, 188 Cal. 625, 628 (206 P. 79]; *Estate of Belknap*, 66 Cal.App.2d 644, 651-652 [152 P.2d 657]; *Baxter* v. *Baxter*, 3 Cal.App.2d 676, 681 [40 P.2d 536]; *Brown* v. *Brown*, 83 Cal.App. 74, 82 [256 P. 595]; *McCahan* v. *McCahan*, 47 Cal.App. 176, 183 [190 P. 460].)''

On this same subject, it was held in *Norris* v. *Norris*, 50 Cal.App.2d 726, 733 [123 P.2d 847] : "Property settlements of this character are valid, subject 'to the general rules which control the actions of persons occupying the confidential relations with each other, as defined by the title on trusts.' Section 158 of the Civil Code. Turning to the title on trusts we find section 2228 of the Civil Code which provides: 'In all matters connected with his trust, a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind.' Every violation of the section is declared to be a fraud against the beneficiary of the trust. Section 2234 of the Civil Code. It is established law that confidential relations are presumed to exist between husband and wife; if the husband obtains any advantage over his wife he must stand

unimpeached of any abuse of the confidence presumptively reposed in him, and failing in this he bears the burden of showing that the transaction was fair and just and fully understood by the party from whom the advantage was obtained. *Estate of Cover*, 188 Cal. 133, 143 [204 P. 583] ; *Locke Paddon* v. *Locke Paddon*, 194 Cal. 73, 80 [227 P. 715]. The policy of the law in respect to such transactions can best be enunciated by quoting from *Estate of Cover, supra*, at page 144: 'In short, a husband, by reason of the marital relation, is bound in his dealings with his wife to the highest and best of good faith and as a consequence is obligated in such dealings not to obtain and retain any advantage over her resulting from concealment or adverse pressure, and he must, if he would avoid the presumption of undue influence emanating from the procurement of any advantage over her, make full and fair disclosure to her of all that she should know for her benefit and protection concerning the nature and effect of the transaction, or else he must deal with her at arm's length and as he would with a stranger, all the while giving her the opportunity of independent advice as to her rights in the premises.' See also *McKay* v. *McKay*, 184 Cal. 742, 747 [195 P. 385], where it was held that this presumption of undue influence in transactions between husband and wife prevails over other presumptions." See, further, *Auclair* v. *Auclair*, 72 Cal.App.2d 791, 802 [165 P.2d 527], where it is stated, among other things: "The trial court must take into consideration all of the surrounding circumstances in determining the issue whether or not the transaction was consummated in the utmost good faith. (*Murdock* v. *Murdock*, 49 Cal.App. 775 [194 P. 762].)"

The case of *Andrew* v. *Andrew*, 51 Cal.App.2d 451, 455 [125 P.2d 47], involves a postnuptial contract which provided on its face: "(1) the parties shall own, share and share alike, the Delhi lots; (2) the husband shall own as his separate property The Eighty Acre farm and (3) each relinquishes his right to succeed to the estate of the other. No mention is made of any other property, real or personal."

In discussing this contract, the court there stated: "Being a purported contract between husband and wife, it was between those standing in a confidential relation and was presumed to be fraudulent. (Civ. Code, sec. 2235.) That presumption continued until it was dispelled and the burden of dispelling said presumption rested on the husband. (*Odell* v.

*Moss,* 130 Cal. 352, 357 [62 P. 555].) That burden he did not assume. The trial court was well within its powers in making the finding which the defendant so vigorously attacks, namely, '. . . the court finds that heretofore the plaintiff and defendant made and entered into an agreement in writing bearing date December 15, 1936, that said agreement was unjust, unfair, unreasonable and inequitable, and that at the time of the preparation and execution of said agreement the defendant concealed from plaintiff and from defendant's attorney certain assets possessed by him.'

''Much is said in the briefs that on December 15, 1936, the defendant did not disclose that the title to the Twelve Acre Tract stood in his name. It is sufficient to state he did not disclose the exact title or any title to said tract. He was bound to have done so if, as he claims, the instrument was to be a property settlement between himself and his beneficiary. (Civ. Code, sec. 2228.) Neither did he state the items or values of the numerous items of personal property hereinabove mentioned.

''We conclude therefore that the defendant did not meet the burden of proof resting on him. He pleaded the purported property settlement. As we have shown the burden rested on him to show that it was just, fair, reasonable and equitable. He did not even attempt to do so. It follows that the finding holding it 'was unjust, unfair, unreasonable, and inequitable' may not be said to be without support. The finding in legal effect was but an application to the facts of the statutory rule. (Civ. Code, sec. 2235, supra.)''

The parties to the instant action were married on June 27, 1943, it being the first marriage of the wife, who was then 18 years of age, and the second marriage of the husband, then 49 years old. Immediately after the marriage they lived in the Los Feliz home, and about three weeks thereafter the wife began working with the husband in his pie business from 5 o'clock in the morning until 7 at night. They then moved to the house on Gramercy Place near the business. Before their marriage respondent told appellant that ''he had enough money to support me and our children and grandchildren very comfortably if he were to retire tomorrow . . . that if I should marry him, that half of everything that he had would be mine.''

With respect to the property settlement agreement, appellant testified as follows: ''Mr. Matassa invited me to go over to Chinatown one evening about two or three weeks after we

were married . . . and we stopped before a building, and he said 'Let's go in here a moment,' and I said 'All right.' I didn't know what he wanted, and I went with him and he took me up to this attorney, William Lee's office, and I asked him what he took me there for, and he said, 'Just a minute,' and we went inside and he asked Mr. Lee if the papers were ready. Q. Had Mr. Matassa mentioned any papers to you before that time? A. No, he had not; and Mr. Lee said 'Yes,' that the papers were all drawn up ready for my signature, and I asked him what he was talking about, and I told him I didn't understand about any papers, and he put papers in front of me, which I didn't understand, and it was all legal terms, and I asked him if I could show it to my family before I signed it, because I didn't know anything about it, and he became very angry, and he said in front of Mr. Lee, 'No, you cannot take them to your family.' He said, 'If you do not sign those papers, we won't get along at all.' . . . he kept after me, I think, for about seven weeks, or maybe a little less, kept after me to sign those papers all the time. He was very cold to me until I did sign them. . . . (he) told me if I signed the papers he would turn over the deed to me of the 346 South Gramercy house." . . . Q. After you signed this agreement did you ever receive anything from Mr. Matassa? A. No, I did not. . . . Q. Did you ever see any attorney alone about this paper and its effects, if any? A. No, I did not. . . . I saw Ward Sullivan. Q. Were you alone when you saw him? A. No, I was not. I went to see Ward Sullivan as a friend, and Mr. Matassa was right there with me. . . . Q. By Mr. Teel: And what did Mr. Ward Sullivan say in the presence of Mr. Matassa at that time? A. Mr. Sullivan immediately said that he didn't see why any such papers were necessary as we were married and that since we were married those papers were not necessary. He didn't even read the papers. He merely glanced over them to see what was done. . . . Q. By Mr. Teel: And nothing more was done about the papers at that time? A. No, nothing was done about the papers." On cross-examination, the following took place: "Q. Did you know Mr. Ward Sullivan before you went to see him about this contract? A. Yes, Mr. Sullivan and the family and I have been friends since we were nine years old, my sister and I used to go with Ward all the time when we were children. . . . Q. What do you mean by saying that he glanced over it? Do you mean he didn't read it? A. He was doing just like you are doing now. He just sort of glanced at it and

didn't read it. . . . he didn't have time to read it, I know that. . . . At the time as I stated before, I didn't understand what the paper meant. I asked Mr. Matassa—I told him that I would like to show it to my family before I signed it, and Mr. Matassa said 'Absolutely not', and that if I didn't sign it that we would not get along. I didn't know what then to do, so I suggested—I said, 'What am I to do?' and then later I said, 'I will talk to Ward,' and he said 'Then we will go and see Ward right away,' and we went from Mr. Lee's office to see Mr. Sullivan. . . . The same evening.''

On redirect examination, this witness was asked: ''Now, at the time you signed this writing that the Court has before him, did Mr. Matassa go into detail as to the extent of his property and his financial ability? A. No, Mr. Matassa never did go into detail about it.''

Respondent Thomas J. Matassa was examined pursuant to section 2055 of the Code of Civil Procedure, during the course of which he testified that he owned the following properties of the approximate value shown:

( 1) A 26-acre vineyard at San Fernando.$15,000 or $20,000;
( 2) Residence at 4213 Dundee Drive, Los Feliz,
................................ $20,000 or $25,000;
( 3) Residence at 346 So. Gramercy Place..$15,000 or more;
( 4) House at 411 Westminster .................$10,000;
( 5) Brick residence on Parkman near Temple,
................................ $ 4,000 or $ 5,000;
( 6) Frame building at 415 North Cedar, Burbank,
................................ $ 6,000 or $ 7,000;
( 7) A building at 1918 Magnolia, Burbank, ......... ——
( 8) A residence at 670 North Normandie.........$ 10,000;
( 9) A house on Lankershim Blvd., Burbank,
................................$10,000 or $15,000;
(10) A one-family home on Western Ave., near Venice Blvd.,
................................ $10,000 or $15,000;
(11) Some vacant lots, one in Culver City and another on West Third St.; one in Springfield, Mass., and some vacant pieces at Atascadero.

He also testified that these properties were acquired prior to his marriage; that since the marriage he had acquired two lots in San Fernando worth $1,000 or $1,500, and had paid off an encumbrance of $5,000 on the Dundee Drive place, which he had rented for $450 per month.

With respect to the property settlement agreement, respondent testified he went to see Mr. Lee, the attorney who drew it, "about two weeks after the wedding," just before Mrs. Matassa started to work in the bakery. In response to the question: "And did you tell her at that time about all these properties that you have been telling the Court about for the last couple of hours?," the witness stated: "No, I did not." And to the question: "Well, did you tell her at that time what properties you had and upon which this agreement would operate?," the witness answered: "No." He further testified as follows: "Q. Did you go to Ward Sullivan's office in connection with that writing? A. Yes, sir, I did. Q. And you were there all the time she was? A. That is right. . . . Q. How old are you Mr. Matassa? A. I will be 53 next May. Q. And you heard Mrs. Matassa testify that she was 22, is that correct? A. That is right, to the best of my knowledge. Q. Now, Mr. Matassa, after you left Ward Sullivan's office, you say he can testify that you had some conversation with Mrs. Matassa concerning this agreement to a property settlement which is set forth in your amendment to your answer, the document that you saw this morning? A. Yes, I had a conversation some time before, yes. Q. What was the conversation, if you do not mind? . . . A. Well, she said she couldn't sign anything that she didn't understand, and then I suggested then to see Mr. Ward Sullivan. . . . Q. Then you went to see Mr. Ward Sullivan that same evening, I think you said? A. We both did, yes. . . . Q. Do I understand your testimony to be that you do not remember whether she asked you at Mr. Lee's office for the privilege of showing the agreement to her father and mother? A. I do not recall that or anything like that being brought up. . . . Q. State the conversation at the time she agreed to go to the bank and sign it. A. I just told her that I was working in the dark, being that everybody was bucking against the whole thing, about the marriage, and I wanted to relieve my mind of it, so I asked her to sign it, so she signed it. . . . Q. Did you tell her anything about your property at that time? A. No, sir, I did not. . . . Q. And you didn't go into any more detail than you had ever gone into? A. I did not. . . . Q. Did she see any other attorney with you or to your knowledge at all? A. She didn't see any attorney with me. Q. The only conversation she had ever had about this agreement before she signed it in the presence of anybody

was with Mr. Ward Sullivan and this other gentleman, Mr. Lee . . . as far as you know? A. That is right.''

In the circumstances disclosed by the record herein, it is perfectly obvious that the property settlement agreement is tainted by an overreaching and abuse of confidence on the part of respondent husband in order to gain an advantage over appellant wife, in that he failed to make any disclosure with respect to the extent of his property and also failed to accord her an opportunity of seeking independent advice as to her rights in the premises. It follows that the court's finding that the property settlement agreement is fair and equitable is not supported by the evidence.

In passing it appears advisable to comment upon the court's finding that paragraphs first and second of the property settlement agreement giving to each an inheritable interest in the property of the other ''are so indefinite and uncertain that the purpose and intention thereof cannot be determined and the same are not enforceable.'' The only evidence upon this question was that of respondent when he denied that he either discussed with his wife or ever told her that she should have an inheritable interest in his property; ''I didn't know that clause existed until this divorce case came up. I just merely asked Mr. Lee to draw up a little contract that she would not be entitled to any of the properties that I had prior to the time of the marriage or in case of divorce that there would be no alimony, and that is all that I asked him to do.''

Keeping in mind that the instant contract is a postnuptial agreement between husband and wife, not made in contemplation of a divorce, the rule enunciated by this court in *Estate of Hurley*, 28 Cal.App.2d 584, 588-589 [83 P.2d 61], appears particularly applicable to the situation under consideration, to wit:

''It is not disputed that husband and wife may by appropriate agreement waive their respective inheritable rights in the estate of the other. It is equally well established, however, that courts will not construe a property settlement between husband and wife as depriving the survivor of inheritance or other rights growing out of the marital relation, except where there is a clear and unmistakable intention to barter away such rights. The agreement before us seems to be, as stated therein, 'a property settlement between the parties, settling everything including community property'. It also contains a mutual release of 'alimony and any and all

money demands that one could make against the other of any kind whatsoever'. There is no release in terms by either one of claims upon the future acquisitions of the other, nor, in terms, any release by either one upon the estate of the other in case of death. . . . In *Jones* v. *Lamont*, 118 Cal. 499, 502 [50 P. 766, 62 Am.St.Rep. 251], it is said: 'We do not think the courts should come to the aid of these contracts so as to deprive either the husband or wife of the property rights growing out of the marriage relation, except where there is a clear and unmistakable intention to barter away such rights.' "

■ An inheritable interest was specifically provided for in the contract herein. This was part of the consideration for the waiver by appellant wife of her right to alimony and attorney's fees. As a result, the disapproval of these two paragraphs and their elimination from the contract without any basis in fact or in law therefor, constituted an abuse of discretion on the part of the trial court.

With respect to the issue of community property, the record is clear that except for the two San Fernando lots, respondent's real property was acquired by him prior to his marriage to appellant. However, it is not disputed that the joint earnings of the parties while engaged in the pie business from the date of the marriage to March of 1945, were community property. Respondent testified that he sold between 500 and 700 pies per day, receiving 55 cents each retail and 45 cents each wholesale; which averaged $250 per day gross; that he had a balance in one bank account on May 18, 1945 of $6,905 from which he withdrew $2,100 and $4,000 to pay for a die in connection with a patent applied for on certain bakery equipment; that his rentals netted him $3,700 per annum. Otherwise, respondent's accounting of the funds of the community during the trial of the instant cause was uncertain and inadequate. And although paragraph second of the property settlement agreement to the effect that "all property acquired subsequent to marriage by either of said parties, shall be considered, and shall be community property of the parties hereto, and said parties shall share and share alike,"—was approved by the trial court, it was not followed in the award made of the community property. It follows that a further accounting must be made in order to determine the extent of the property acquired after the marriage of the parties hereto.

Since it will be necessary for the trial court to make new findings with respect to (1) the invalidity of the property settlement agreement; (2) the extent and amount of property acquired by the parties subsequent to their marriage constituting community property; and (3) an adequate allowance to appellant's wife for alimony, attorney's fees and costs, it will serve no useful purpose to discuss the questions raised on the appeal from the order amending *nunc pro tunc* the findings, conclusions and judgment herein.

For the reasons stated, the *nunc pro tunc* order and those portions of the interlocutory judgment appealed from are, and each of them is, reversed, with instructions to the trial court to proceed in accordance with the views herein expressed.

Doran, J., and White, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 11, 1948.